**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| KATELYNN MCALLISTER, Individually, and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 6:25-cv-00294 |
| v. | **JURY TRIAL DEMANDED** |
| AMERICAN INCOME LIFE INSURANCE CO. and GLOBE LIFE, INC. | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Katelynn McAllister, through her undersigned counsel, brings this action against American Income Life Insurance Co. ("AIL") and Globe Life, Inc. ("Globe Life", collectively "Defendants") pursuant to the investigation of her attorneys, personal knowledge as to herself and her own acts and otherwise upon information and belief, and alleges as follows:

## INTRODUCTION

1. AIL is a life insurance company based in Waco, Texas which is a wholly-owned subsidiary of Defendant Globe Life, Inc. Globe Life advertises itself as having an "A" rating from independent insurance analyst A.M. Best Company and reportedly has more than $220 billion of coverage in force." Globe Life and its "family of companies" are marketed as providing "secure life and supplemental health insurance protection to our policyholders today and in the future" and claims that "Globe Life will be there when you need us the most."[1]

[1] https://home.globelifeinsurance.com/about, last accessed June 24, 2025.

2. On June 14, 2024, Globe Life filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") describing vulnerabilities in its data security, specifically claiming, in part, that "following an inquiry from a state insurance regulator, [Globe Life] initiated a review of potential vulnerabilities related to access permissions and user identity management for a Company web portal that likely resulted in unauthorized access to certain consumer and policyholder information."[2]

3. This June 14, 2024 disclosure followed a June 12, 2024 letter to the U.S. Department of Health and Human Services, Office for Civil Rights ("DHHS") and state insurance regulators from financial research firm Viceroy Research, LLC ("Viceroy"), stating, among other things, that it had conducted an investigation demonstrating "significant vulnerabilities in the data privacy and protection practices of the insurance holding company [Globe Life]" that "reflect[ed] a systemic lack of data security and access controls across all of [Globe Life's] subsidiaries and captive agencies, which fail to meet their legal obligations to safeguard policyholders personal and private information."

4. On or about October 17, 2024, Globe Life reported to the SEC that it had been the recipient of a hack and exfiltration of sensitive personal information ("SPI") involving approximately five thousand individuals who are or were its clients (the "Data Breach").[3] Globe Life's October 17, 2024 Form 8-K/A stated that "[b]ased on the Company's investigation to date, which remains ongoing, the Company believes that information relayed to the Company by the

---

[2] https://www.sec.gov/Archives/edgar/data/320335/000032033524000029/gl-20240614.htm, last accessed June 24, 2025

[3] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/320335/000032033524000056/gl-20241017.htm, last accessed June 24, 2025.

threat actor may relate to certain customers and customer leads that can be traced to the Company's subsidiary, American Income Life Insurance Company."[4]

5. In February 2025, Globe Life publicly reported that, in fact, the number of potential victims of the Data Breach was far larger, closer to 850,000 individuals.[5]

6. Globe Life reported that this SPI included, at least, names, addresses, dates of birth, Social Security numbers, email addresses, phone numbers, health information, and insurance policy information.[6]

7. Globe Life claimed in its October 17, 2024 SEC filing that the Data Breach appeared to be was limited to SPI from policyholders of Globe Life's subsidiary AIL. However, even if this is an accurate statement, both Defendants Globe Life and AIL are responsibility and liable for the Data Breach, because, as described below, the Breach was reportedly the result of "significant vulnerabilities in the data privacy and protection practices of the insurance holding company [Globe Life]" that "reflect[ed] a systemic lack of data security and access controls across all of [Globe Life's] subsidiaries and captive agencies, …"[7]

8. Plaintiff and other members of the Class of similarly situated victims (defined further below) whose SPI was compromised by the Data Breach now face a present and imminent lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

9. The information stolen in cyber-attacks allows the modern thief to assume victims' identities when carrying out criminal acts such as:

---

[4] https://www.sec.gov/Archives/edgar/data/320335/000032033524000056/gl-20241017.htm , last accessed June 24, 2025.
[5] https://www.securityweek.com/insurance-company-globe-life-notifying-850000-people-of-data-breach/, last accessed June 24, 2025.
[6] *Id.*
[7] *Infra* ¶¶ 22.

- Filing fraudulent tax returns;
- Using victims' credit history;
- Making financial transactions on behalf of victims, including opening credit accounts in victims' names;
- Impersonating victims via mail and/or email;
- Impersonating victims in cyber forums and social networks;
- Stealing benefits that belong to victims; and/or
- Committing illegal acts which, in turn, incriminate victims.

10. Plaintiff's and other Class members' SPI was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect the SPI of Plaintiff and Class members.

11. As of this writing, there exist many Class members who have no idea their SPI has been compromised, and that they are at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

12. Plaintiff brings this action on behalf of all persons whose SPI was compromised as a result of Defendants' failure to: (i) adequately protect consumers' SPI, (ii) adequately warn its current and former customers and potential customers of its inadequate information security practices, and (iii) effectively monitor its platforms for security vulnerabilities and incidents. Defendants' conduct amounts to negligence and violates state statutes, as specified further below.

13. Plaintiff and similarly situated individuals have suffered injury as a result of Defendants' conduct. These injuries include: (i) lost or diminished inherent value of SPI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to necessary uncompensated lost time; and (iv) the continued and certainly an increased risk to their SPI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the SPI.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendants. Defendants are citizens of Texas. Plaintiff is a citizen of West Virgina.

15. This Court has personal jurisdiction because Defendant AIL's principal place of business is located within the Waco Division of the Western District of Texas.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from the Waco Division of the Western District of Texas. Defendant AIL's principal place of business is within Waco Division of the Western District of Texas and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## PARTIES

17. Plaintiff Katelyn McAllister is a citizen of West Virginia, residing in Brooke County. On or about June 28, 2025, Plaintiff was informed via notice letter from AIL dated June 18, 2025 (the "Notice Letter") that she had been a victim of the Data Breach.

18. Defendant American Income Life Insurance Company is a for-profit corporation with its principal place of business at 1200 Wooded Acres Drive, Waco, Texas, 76710. It is a wholly-owned subsidiary of Defendant Globe Life, Inc. Defendant is a citizen of Texas.

19. Defendant Globe Life, Inc. is a for-profit Delaware corporation with its principal place of business at 3700 S. Stonebridge Dr., McKinney, Texas. It's registered agent for service

of process is CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201. Defendant is a citizen of Texas.

## FACTUAL ALLEGATIONS

20. Defendants AIL and Globe Life are nationwide life insurance companies, with AIL being a wholly-owned subsidiary of Globe Life.

21. In the ordinary course of doing business with Defendants, customers provide Defendant with SPI such as, for example:

a. Name, address, phone number;

b. Authentication and security information such as government identification, Social Security number, and signature;

c. Demographic information, such as age, gender, and date of birth;

d. Medical information, including self-reported medical histories; and

e. Bank account information, such as bank account number.

22. On June 12, 2024, financial investigative research firm Viceroy sent its letter to the DHHS, as well as reportedly notified state insurance regulators, that it had conducted an investigation demonstrating "significant vulnerabilities in the data privacy and protection practices of the insurance holding company [Globe Life]" that "reflect[ed] a systemic lack of data security and access controls across all of [Globe Life's] subsidiaries and captive agencies, which fail to meet their legal obligations to safeguard policyholders personal and private information."[8]

23. This is a summary of the extensive flaws and vulnerabilities in Globe Life's data security systems that were flagged in the Viceroy report and in the DHHS letter, which concluded

---

[8] https://viceroyresearch.org/wp-content/uploads/2024/06/Globe-Life-Cyber-Security-Failures.pdf, last accessed July 2, 2025.

that "Globe Life fails to meet their legal obligations to safeguard policyholders' personal and private information." Globe Life's June 12, 2024 letter to the DHHS also reported

> ***Overview of Breaches:***
> AIrecords:
>
> Globe Life agencies provide recruits and agents with a "playbook" that includes universal login credentials for https://prodwebapps. ailife.com/apsweb/, Globe Life's attending physician statement database.
>
> These credentials, which have remained unchanged for over four years, are publicly accessible on various platforms. This database permits searches by case number, policy number, or name, thereby revealing detailed medical and personal information, including data of minors.
>
> Globe Life's [AIL] subsidiary experiences exceptionally high staff turnover, averaging approximately 1,600 new agent recruitments per month while losing 1,500 agents per month. Each of these many thousands of agents that have worked at AIL over at least the last four years retains access to policyholders' personal and private information.
>
> The section on which, until June 2, 2024, was not password protected links to spreadsheets containing sensitive policyholder information such as policy numbers, names, phone numbers, and coverage details. These spreadsheets, still accessible via archived URLs, represent a clear data protection breach.
>
> ***Scope of Breach:***
> The Globe Life agents, considered contractors, have unfettered access to sensitive medical underwriting data on the AIrecords platform. The unchanged login credentials over several years make it nearly impossible to trace unauthorized access.
>
> Similarly, the unprotected spreadsheets at contain the details of over 1,057 policies, accessible to current and former agents without restriction. Any sufficiently motivated third party can also access the medical underwriting data and spreadsheets.
>
> ***Violations:***
> We believe that Globe Life and [AIL's] data management practices breach the following provisions:
>
> - NAIC Insurance Data Security Model Law:
>     - Section 4(D)(2)(a): Failure to implement access controls to protect Nonpublic Information.

- Section 4(D)(2)(g): Failure to utilize effective security controls, such as Multi-Factor Authentication.

- Gramm-Leach-Bliley Act (GLBA):
  - FTC Title 16 CFR Part 314: Failing to limit access to necessary customer information, monitor user activity, and implement multifactor authentication.

- Health Insurance Portability and Accountability Act (HIPAA):
  - DHHS Title 45 CFR 164.306(a): Failing to meet general security requirements.
  - DHHS Title 45 CFR 164.312(a)(2)(i): Not using unique user identification.
  - DHHS Title 45 CFR 164.308(a)(3)(i): Lacking appropriate workforce security policies.
  - DHHS Title 45 CFR 164.312(d): Not authenticating the person or entity accessing sensitive information.

- California Financial Information Privacy Act (CFIPA):
  - Section 4056(a)(2)(B): Failing to limit the use of nonpublic personal information to authorized transactions.

- Children's Online Privacy Protection Act (COPPA):
  - Section 312.8: Failing to ensure the security, confidentiality, and integrity of personal information collected from children.[9]

24. Further, Viceroy reported on June 14, 2024, after Globe Life had issued its Form 8-K the day before, "that Protected Health Information (PHI) records of Globe Life's clients are freely accessible via online portals with universal login credentials distributed by agents across the web", and that "HIPAA Protected Health Information of Globe Life & AIL's clients are freely accessible online via agent portals with universal logins, distributed on public agent websites." [10] Viceroy stated that these conclusions were grounded in its own experience and investigation,

---

[9] https://viceroyresearch.org/wp-content/uploads/2024/06/Globe-Life-Cyber-Security-Failures.pdf, last accessed July 2, 2025.

[10] https://viceroyresearch.org/wp-content/uploads/2024/06/Globe-Life-Cyber-Security-Failures.pdf, last accessed July 2, 2025.

claiming that "[w]hile Globe Life reports that the vulnerabilities have been patched, Viceroy has still been able to re-access consumer and policyholder data. We do not intend to disclose instructions on how to access live data and have not retained exploited data except for the purposes of reporting it to regulatory authorities."[11]

25. This information clearly had an impact on Globe Life, because just two days later, on June 14, 2024, Globe Life filed its Form 8-K with SEC stating, in part, that

> On June 13, 2024, following an inquiry from a state insurance regulator, [Globe Life] initiated a review of potential vulnerabilities related to access permissions and user identity management for a Company web portal that likely resulted in unauthorized access to certain consumer and policyholder information. Immediately upon notification of these circumstances, the Company removed external access to the portal. At this time, the Company believes the issue is specific to this portal, and all other systems remain operational. The Company's operations will not be significantly impacted by the removal of external web access to the portal in question. The Company has activated its incident response plan and retained leading security experts to investigate and assist in the remediation of any potential issues.
>
> As the investigation of the incident is ongoing, the full scope, nature and impact of the incident are not yet known; however, as of the date of this report, the incident has not had a material impact on the Company's operations, and the Company has not determined whether this is a material cybersecurity incident required to be reported under Item 1.05 of Form 8-K.[12]

26. On or about October 7, 2024, Globe Life reported to the SEC that the Data Breach had occurred, stating:

> This information includes certain personally identifiable information categories such as names, email addresses, phone numbers, postal addresses, and in some instances Social Security numbers, health-related data, and other policy information for

---

[11] https://viceroyresearch.org/wp-content/uploads/2024/06/Globe-Life-Cyber-Security-Failures.pdf (emphasis omitted), last accessed July 2, 2025.

[12] https://www.sec.gov/Archives/edgar/data/320335/000032033524000029/gl-20240614.htm, last accessed June 24, 2025

> approximately 5,000 individuals; however, the total number of potentially impacted persons or the full scope of information possessed by the threat actor has not been fully verified. This information does not appear to contain personally identifiable financial information such as credit card data or banking information. Most recently, the threat actor also shared information about a limited number of individuals to short sellers and plaintiffs' attorneys. The threat actor claims to possess additional categories of information, which claims remain under investigation and have not been verified.[13]

27. By early 2025, media outlets began reporting that the Data Breach was much larger and more impactful than previously suspected. On January 31, 2025, outlets reported that "[t]he hackers obtained Social Security numbers, names, addresses, health-related data and more. [Globe Life] said the incident did not involve ransomware and reiterated that finding in the updated filing on Thursday. The filing this week confirmed that names, email addresses, phone numbers, postal addresses, Social Security numbers, health data and insurance policy information were accessed by the hackers."[14]

28. While Defendants became aware of the Data Breach no later than October 7, 2024, it took approximately eight months for Defendants to notify impacted individuals of the Breach.

29. As a result, Plaintiff's and other Class members' SPI was in the hands of hackers for no less than eight months, and perhaps much longer, before Defendants began notifying them of the Data Breach.

30. As of this writing, Defendants have offered no concrete information on the steps they have taken or specific efforts made to reasonably ensure that such a breach cannot or will not occur again.

---

[13] https://www.sec.gov/ix?doc=/Archives/edgar/data/320335/000032033524000056/gl-20241017.htm, last accessed June 24, 2025.
[14] https://therecord.media/globe-life-updated-sec-filing-hackers-extortion-data-breach. Last accessed June 24, 2025.

31. Defendants are reportedly offering minimal if any additional assistance to Plaintiff and other Class members beyond an inadequate offer of free credit monitoring.

32. This response is entirely inadequate to Plaintiff and other Class members who now potentially face years of heightened risk from the theft of their SPI and who may have already incurred substantial out-of-pocket costs in responding to the Data Breach.

33. Defendants had and have obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class members, to keep their SPI confidential and to protect it from unauthorized access and disclosure.

34. Plaintiff and Class members provided their SPI to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with its obligations to keep such information confidential and secure from unauthorized access.

35. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches generally, and increases in the private sector and the insurance industry specifically preceding the date of the breach.

36. Indeed, data breaches, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry, including Defendants.

37. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to

resolve.[15] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[16]

38. The SPI of Plaintiff and members of the Class was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the SPI for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

39. Defendants knew, or reasonably should have known, of the importance of safeguarding the SPI of Plaintiff and members of the Class, including Social Security numbers, dates of birth, and other sensitive information, as well as of the foreseeable consequences that would occur if Defendants' data security systems were inadequate to safeguard this SPI and were breached, including, specifically, the significant costs that would be imposed on Plaintiff and other members of the Class a result of a breach.

40. Plaintiff and members of the Class now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class has incurred, is incurring and will continue to incur such damages in addition to any fraudulent use of their SPI.

41. The injuries to Plaintiff and members of the Class were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the SPI of Plaintiff and other members of the Class.

42. The FTC has promulgated numerous guides for businesses which highlight the

---

[15] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf, last accessed June 24, 2025.

[16] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

43. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

44. The FTC further recommends that companies not maintain SPI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

45. The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

46. Defendants failed to properly implement basic data security practices, and its

failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer SPI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

47. A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendants' cybersecurity practices.

48. Best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

49. Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identity theft and other types of fraud.

50. The SPI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[17]

51. Social Security numbers, for example, are among the worst kind of personal

---

[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs, last accessed June 24, 2025.

information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[18]

52. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

53. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

54. Furthermore, as the SSA warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have

---

[18] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), https://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed June 24, 2025.

[19] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft, last accessed June 24, 2025.

> records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[20]

55. Here, the unauthorized access left the cyber criminals with the tools to perform the most thorough identity theft—they have obtained all the essential SPI to mimic the identity of the user. The personal data of Plaintiff and members of the Class stolen in the Data Breach constitutes a dream for hackers and a nightmare for Plaintiff and the Class. Stolen personal data of Plaintiff and members of the Class represents essentially one-stop shopping for identity thieves.

56. The FTC has released its updated publication on protecting SPI for businesses, which includes instructions on protecting SPI, properly disposing of SPI, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

57. General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from

---

[20] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed June 24, 2025.

data breaches cannot necessarily rule out all future harm.[21]

58. Companies recognize that SPI is a valuable asset. Indeed, SPI is a valuable commodity. A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other SPI on a number of Internet websites. The stolen personal data of Plaintiff and members of the Class has a high value on both legitimate and black markets.

59. Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The U.S. government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

60. As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns. Defendants' former and current customers whose Social Security numbers have been compromised now face a real, present, imminent and substantial risk of identity theft and other problems associated with the disclosure of their Social Security number and will need to monitor their credit and tax filings for an indefinite duration.

61. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change — Social Security number, driver license number or government-issued identification number, name, and date of birth.

62. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the

[21] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29, last accessed June 24, 2025.

black market."[22]

63. Among other forms of fraud, identity thieves may obtain driver licenses, government benefits, medical services, and housing or even give false information to police. An individual may not know that his or her driver license was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

64. The SPI of children is particularly valuable for hackers as children's information is routinely viewed as more valuable than adult information because children's SPI is not routinely monitored and misused SPI can go undiscovered for years.[23]

65. While Globe Life claimed in its October 17, 2024 SEC filing that the Data Breach appeared limited to SPI from policyholders of its subsidiary AIL, even if true, both Globe Life and AIL are culpable and liable for the Data Breach because the Breach allegedly resulted from "significant vulnerabilities in the data privacy and protection practices of the insurance holding company [Globe Life]" that "reflect[ed] a ***systemic lack of data security and access controls across all of [Globe Life's] subsidiaries and captive agencies***, …"[24]

66. Furthermore, Globe Life's was and is the sole owner and controller of AIL, and has, had and/or assumed responsibilities for, among other things, implementing and maintaining reasonable security procedures and practices appropriate to the nature of storing the SPI belonging to Plaintiff and other Class members, and monitoring and/or protection of SPI Plaintiff and other Class members; responsibilities that it failed to fulfill, resulting in the Data Breach.

---

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html, last accessed June 24, 2025.
[23] *See* https://www.wral.com/news/education/powerschool-breach-why-children-are-vulnerable-how-to-protect-them-may-2025/, last accessed June 24, 2025.
[24] *Supra* ¶¶ 22 (emphasis added).

## FACTS SPECIFIC TO PLAINTIFF

67. Plaintiff was required, in order to apply for and obtain insurance products from Defendants, PII including, among other things, financial, health, her Social Security number, date of birth, and other information. As a result, Defendants possessed, stored, maintained and controlled that information, and were responsible for it and for safeguarding it and keeping it secure and confidential for as long as it was stored and in its possession, custody and/or control.

68. As a result of these circumstances, and Defendants' failure to do so and their failure to fulfill their duties and responsibilities in this respect, Plaintiff's SPI was among the data accessed by an unauthorized third-party in the Data Breach.

69. Plaintiff received a Notice Letter from Defendant AIL on or around June 28, 2025, stating that Plaintiff's SPI, including name, date of birth, Social Security number, health-related information, and policy information, was involved in the Data Breach.

70. On approximately June 28, 2025, Plaintiff discovered that an unknown person or persons opened an account in her name at Wells Fargo. Plaintiff has since managed to close this account, but doing so required considerable time and effort and caused distress to Plaintiff.

71. Plaintiff is aware of no other source from which her SPI could have come from in opening the Wells Fargo account. Further, everything needed to open a bank account was a part of the Data Breach.

72. As a result of the Data Breach, Plaintiff was and continues to be injured in multiple material respects.

73. Plaintiff has suffered significant necessary uncompensated lost time dealing with the consequences of the Data Breach. This includes and continues to include, among other things: time spent closing the account fraudulently opened in her name; verifying the legitimacy and impact

of the Data Breach; time spent exploring potentially applications for a credit freeze, credit monitoring options, and identity theft insurance options; time spent self-monitoring her financial accounts with heightened scrutiny; and time spent searching for and consulting with legal counsel regarding options for seeking and remedying and/or mitigating the effects of the Data Breach. Plaintiff regularly takes reasonable steps to safeguard her own SPI in her own control.

74. Since the time of the Data Breach, Plaintiff has spent time dealing with the fallout from the breach and has suffered anxiety due to the dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her SPI for purposes of identity theft and fraud. Plaintiff is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

75. Plaintiff also has been and continues to be injured by the serious and material risk of future harm suffered from the Data Breach; this risk is imminent and substantial Plaintiff's data has been in fact stolen and misused as a result of the Data Breach. The highly sensitive and confidential nature of the data involved continues to present a very high risk of identity theft or fraud, and the significant likelihood that some or all of Plaintiff's exposed information will be further misused.

76. Plaintiff and other Class members also suffered actual injury in the form of damages to and diminution in the value of their SPI—a condition of intangible property that they entrusted to Defendants, which was compromised in and as a result of the Data Breach.

77. As mentioned above, as a result of the Data Breach, Plaintiff also has experienced increased anxiety as a result of the loss of privacy and anxiety over the impact of cybercriminals accessing, using, and selling their SPI and financial information.

78. Plaintiff (and other Class members) have also suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their SPI and financial information being placed in the hands of unauthorized third parties/criminals.

79. Plaintiff and other Class members have a strong continuing interest in ensuring that their SPI and financial information, which, upon information and belief, remains backed up in Defendants' possession, custody and/or control, is protected and safeguarded from future breaches on a consistent and ongoing basis. The same is true of other Class members.

80. Had Plaintiff (and other Class members) known that their SPI would not have been adequately secured and protected by Defendants, they would not have provided their SPI to Defendants, done business with Defendants or purchased Defendants' products or services in such a way that required that they provide their SPI to Defendant, and/or they would have insisted that the SPI at issue not be stored, or continue to be stored, in Defendants' insecure network, databases and systems.

81. Plaintiff (and other Class members) has suffered actual injury from having her SPI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her SPI, a form of property that Defendants obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

82. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## CLASS ACTION ALLEGATIONS

83. Plaintiff brings this class action pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class:

> All natural persons residing in the United States whose SPI was compromised in the Data Breach that was referenced in announcements made by by Defendant Globe Life and/or Defendant AIL on or about October 7, 2024 or afterward.

84. Excluded from the Class are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members.

85. Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

86. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. Defendants have, as of this writing, indicated that the total number of Class Members is approximately 850,000. The Class is readily identifiable within Defendants' records.

87. **Commonality**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual members of the Class. These include:

a. When Defendants actually learned of the Data Breach and whether its response was adequate;

b. Whether Defendants owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their SPI;

c. Whether Defendants breached that duty;

d. Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of storing the SPI of Plaintiff

and members of the Class;

e. Whether Defendants acted negligently in connection with the monitoring and/or protection of SPI belonging to Plaintiff and members of the Class;

f. Whether Defendants knew or should have known that it did not employ reasonable measures to keep the SPI of Plaintiff and members of the Class secure and to prevent loss or misuse of that SPI;

g. Whether Defendants has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Defendants caused Plaintiff's and members of the Class damage;

i. Whether Defendants violated the law by failing to promptly notify Plaintiff and members of the Class that their SPI had been compromised; and

j. Whether Plaintiff and the other members of the Class are entitled to credit monitoring and other monetary relief.

88. **Typicality**: Plaintiff's claims are typical of those of the other members of the Class because all had their SPI compromised as a result of the Data Breach due to Defendants' misfeasance.

89. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's counsel are competent and experienced in litigating privacy-related class actions.

90. **Superiority and Manageability**: Under rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual member of the Class are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendants' misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action

will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

91. Class certification is also appropriate under Rule 23(a) and (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

92. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiff and members of the Class to exercise due care in collecting, storing, using, and safeguarding their SPI;
b. Whether Defendants breached a legal duty to Plaintiff and the members of the Class to exercise due care in collecting, storing, using, and safeguarding their SPI;
c. Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;
d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and
e. Whether members of the Class are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

**FIRST CLAIM FOR RELIEF**
**Negligence**
**(Against Both Defendants, By Plaintiff Individually and on Behalf of the Class)**

93. Plaintiff hereby re-alleges and incorporates by reference all of the allegations in

paragraphs 1 to 92.

94. Defendants routinely handle SPI that is required of its customers, such as Plaintiff.

95. By collecting and storing the SPI of its customers (and employees and prospective employees), Defendants owed a duty of care to the individuals whose SPI it collected to use reasonable means to secure and safeguard that SPI.

96. As an insurance provider, Defendants are aware of that duty of care to the SPI of its customers.

97. Additionally, as a covered entity, Defendants have a duty under HIPAA privacy laws to protect the confidentiality of patient healthcare information, including the kind stolen as part of the Data Breach.

98. Defendants have full knowledge of the sensitivity of the SPI and the types of harm that Plaintiff and Class members could and would suffer if the SPI were wrongfully disclosed.

99. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of their current, former, and prospective employees' SPI, and that of their beneficiaries and dependents, involved an unreasonable risk of harm to Plaintiff and Class members, even if the harm occurred through the criminal acts of a third party.

100. Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that Plaintiff's and Class members' information in Defendants' possession was adequately secured and protected.

101. Defendants also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and Class members' SPI.

102. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class members was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

103. Plaintiff and the Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of should have known of the inherent risks in collecting and storing the SPI of Plaintiff and the Class, the critical importance of providing adequate security of that SPI, and the necessity for encrypting SPI stored on Defendants' systems.

104. Defendants' own conduct created a foreseeable risk of harm to Plaintiff and Class members. Defendants' misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiff's and Class members' SPI, including basic encryption techniques freely available to Defendant.

105. Plaintiff and the Class members had no ability to protect their SPI that was in, and possibly remains in, Defendants' possession, custody and/or control.

106. Defendants were in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

107. Defendants had and continues to have a duty to adequately disclose that the SPI of Plaintiff and Class members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their SPI by third parties.

108. Defendants had a duty to employ proper procedures to prevent the unauthorized

dissemination of the SPI of Plaintiff and Class members.

109. Defendants have admitted that the SPI of Plaintiff and Class members was purposely exfiltrated and disclosed to unauthorized third persons as a result of the Data Breach.

110. Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and Class members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the SPI of Plaintiff and Class members during the time the SPI was within Defendants' possession or control.

111. Defendants improperly and inadequately safeguarded the SPI of Plaintiff and Class members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

112. Defendants failed to heed industry warnings and alerts to provide adequate safeguards to protect its current and former employees' SPI in the face of increased risk of theft.

113. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former employees' SPI.

114. Defendants, through their actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and Class members the existence and scope of the Data Breach.

115. But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class members, the SPI of Plaintiff and Class members would not have been compromised.

116. There is a close causal connection between Defendants' failure to implement security measures to protect the SPI of Plaintiff and Class members and the harm suffered or risk of imminent harm suffered by Plaintiff and the Class. Plaintiff's and Class members' SPI was lost

and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such SPI by adopting, implementing, and maintaining appropriate security measures.

117. As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their SPI is used; (iii) the compromise, publication, and/or theft of their SPI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their SPI, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the SPI of its employees and former employees in its possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the SPI compromised as a result of the Data Breach for the remainder of Plaintiff's and Class members' lives.

118. Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and Class members have suffered and will suffer the continued risks of exposure of their SPI, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the SPI in its continued possession.

## SECOND CLAIM FOR RELIEF
### Breach of Implied Contract

**(Against Both Defendants, By Plaintiff Individually and on Behalf of the Class)**

119. Plaintiff and the Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 92.

120. In connection with receiving services, Plaintiff and members of the Class entered into implied contracts with Defendants.

121. Pursuant to these implied contracts, Plaintiffs and Class members paid money to Defendants and provided Defendants with their SPI. In exchange, Defendants agreed to, among other things, and Plaintiff understood that Defendants would: (1) provide services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' SPI; and (3) protect Plaintiff's and Class members' SPI in compliance with federal and state laws and regulations and industry standards.

122. The protection of SPI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Defendants, on the other hand. Had Plaintiff and Class members known that Defendants would not adequately protect its clients' SPI, they would not have received financial or other services from Defendants.

123. Plaintiff and Class members performed their obligations under the implied contract when they provided Defendants with their SPI and paid for financial or other services from Defendants.

124. Defendants breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their SPI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' SPI in a manner that complies with applicable laws, regulations, and industry standards.

125. Defendants' breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

126. Plaintiff and all other Class members were damaged by Defendants' breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their SPI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their SPI has been breached; (v) they were deprived of the value of their SPI, for which there is a well-established national and international market; (vi) necessary uncompensated lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**<u>THIRD CLAIM FOR RELIEF</u>**
**Unjust Enrichment, in the Alternative**
**(Against Both Defendants, By Plaintiff Individually and on Behalf of the Class)**

127. Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 92.

128. Plaintiff and Class Members conferred a monetary benefit upon Defendants in the form of storing their SPI with Defendants in such a way that saved expense and labor for Defendants.

129. Defendants appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Defendants also benefited from the receipt of Plaintiff's and Class members' SPI, as this was used by Defendants to facilitate its core functions.

130. The benefits given by Plaintiff and Class members to Defendants were to be used by Defendants, in part, to pay for or recoup the administrative costs of reasonable data privacy and security practices and procedures.

131. As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount to be determined at trial.

132. Under principles of equity and good conscience, Defendants should not be permitted to retain a benefit belonging to Plaintiff and Class members because Defendants failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and Class members granted to Defendants or were otherwise mandated by federal, state, and local laws and industry standards.

133. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds or benefits it received as a result of the conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all Class members, requests judgment against the Defendants and the following:

A. For an Order certifying the Class as defined herein, and appointing Plaintiff and her counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and the Class members' SPI;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and

Class members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiff and Class members' personal identifying information;

iv. prohibiting Defendants from maintaining Plaintiff's and Class members' personal identifying information on a cloud-based database (if, in fact, it does so);

v. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vi. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

viii. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix. requiring Defendants to conduct regular database scanning and securing checks;

x. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class members;

xi. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately

monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendants to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvi. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment; and

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For pre- and post-judgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: July 10, 2025

Respectfully Submitted,

*/s/ Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
214-744-3000
214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com

*Local Counsel for Plaintiff and the Proposed Class*

Carl V. Malmstrom*
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

Kent A. Bronson*
**BRONSON LEGAL LLC**
1216 Broadway (2nd Floor)
New York, NY 10001
Tel: (609) 255-1031
Fax:
bronsonlegalny@gmail.com

**pro hac vice forthcoming*

*Attorneys for Plaintiff and the Proposed Class*